**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MICHAEL BROOKS,**

       **Plaintiff,**

                                **Case No. C2-04-740**
     **vs.**                        **Judge Edmund A. Sargus, Jr.**
                                **Magistrate Judge Norah McCann King**

**LOWE'S HOME CENTERS, INC.,**

       **Defendant.**

## OPINION AND ORDER

This case arises under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*., ("FMLA") in which Plaintiff, Michael Brooks, alleges that his former employer, Defendant, Lowe's Home Centers, Inc., interfered with and restrained his rights under the FMLA by unlawfully terminating his employment. This matter is now before the Court for consideration of the parties' Cross-Motions for Summary Judgment. Because genuine issues of material fact remain as to two key elements of Plaintiff's case, Plaintiff's Motion is denied and Defendant's Motion is denied.

**I.**

**A.**     **Plaintiff's Employment with Lowe's**

Plaintiff began his employment at Lowe's Home Centers, Inc. ("Defendant" or "Lowe's") at the age of 23, on June 4, 1999, as an hourly employee in the millwork department at Lowe's Hilliard store. (Plf. Dep. pp. 120-121; Plf. Dep. Ex. 2.) Plaintiff participated in a new employee orientation meeting during which he received a New Employee Orientation Guide. The Guide contained Lowe's policies and procedures, including its standards of conduct, attendance policy, call

in procedure and FMLA policy.  (Plf. Dep. pp. 206-207, 209-214; Plf. Dep. Exs. 2, 3, 4, 5.)

      Over the course of his employment, Plaintiff regularly advanced and his supervisors described him as an excellent employee.[1]  In December 2000, Plaintiff was promoted to the position of millwork specialist and transferred to the Lowe's Easton store. Eventually, Brooks was promoted to assistant manager over the millwork department at the Easton store.  In February 2003, Dennis Hermsen ("Hermsen") became the store manager at Easton.  Hermsen described Plaintiff as a "great player" who worked extremely hard. (Hermsen Dep. pp. 11, 20.)  When Plaintiff "ran the pluming department he was excellent." (*Id.*)  Brooks was one of the "top flight department heads…in the entire store." (*Id.*)  In March 2003, Plaintiff moved laterally to the position of electrical and plumbing department manager.  (Plf. Dep. 132.)

### B.     Lowe's Policies and Procedures Relating to Attendance

      Lowe's maintains several policies addressing attendance and leaves of absence including the following: (1) "Standards of Conduct" that prohibit unreported absences of three scheduled workdays; (2) an "Attendance" policy requires employees to provide a physician's statement when they are absent for more than three consecutive days; (3) a "Call In Procedure" that requires employees to call the Manager-On-Duty to report an absence; and (4) a "Performance Management" policy which provides that failure to report to, or call off from, work for three consecutive shifts is a terminable offense.  Plaintiff testified that he had learned and understood the requirements of these policies, as well as the sanctions for violating them.  Once he became an assistant manager, Plaintiff in fact was required to enforce them as to employees who reported to him.  (Plf. Dep. pp. 140, 142,

---

[1]     Plaintiff was occasionally cautioned and disciplined for tardiness during the years 2000-2002.  (Plf. Dep., Exh. 9, 10, 11, 12, & 13.)

149, 159, 195, 209-213, 215-222, 225.)

As a department manager, Plaintiff reported to zone managers, as well as to Store Manager Dennis Hermsen and Operations Manager Paul Kincaid.  (Plf. Dep. pp. 156, 163.)

### C. Plaintiff's Physical Condition

In late September or early October 2003, Plaintiff began to experience uncomfortable and distressing feelings in social settings. (Plf. Dep. p.120; Brooks Aff. ¶ 4). He initially began to feel ill at a wedding ceremony in which he participated as a groomsman.  Just before the ceremony Plaintiff began to perspire, felt ill, and became very anxious and uneasy. (Plf. Dep. pp. 239-244; Brooks Aff. ¶ 4).

Plaintiff began to experience these and similar symptoms more frequently.  More specifically, Plaintiff began to experience bouts of sweating, nausea, vomiting, indigestion, memory loss and skin crawling sensations, although not all at once.  (Plf. Dep. pp. 241-242, 247, 250.)  Plaintiff associated his symptoms with being in a social environment.  (Plf. Dep. p. 239.)  In early October 2003, Plaintiff began to experience some of the symptoms while at work; however, he never vomited or experienced memory loss while on the job. (Plf. Dep. 245-246, 248.)  Plaintiff left work early on the two days he reported to work after the wedding weekend because he was experiencing these symptoms.

On October 7, 2003, Plaintiff recalls meeting Hermsen and the Human Resources Manager, Jodi Metzger ("Metzger") to discuss his need for leave.  Plaintiff talked with Hermsen and Metzger in detail about his symptoms and need for leave. (Plf's Dep. pp. 249-251.)  At that meeting, Plaintiff explained to both Hermsen and Metzger exactly how he was feeling, including that he was anxious around customers, felt like his skin was crawling, that he was nauseous at times, and that he broke

into sweats. Plaintiff also told Hermsen and Metzger that he had scheduled an appointment with his physician. (Plf. Dep. 250-252; Brooks Aff. ¶ 6.)  According to Brooks, during this meeting Metzger sat at her computer and did not pay attention. (Plf. Dep. 250-251; Brooks Aff. ¶ 6.)  At the end of the meeting, Hermsen told Plaintiff that everything was fine and requested that Brooks keep him informed. (Brooks Aff. ¶ 6).

Plaintiff sought medical attention and, on October 8, 2003, Plaintiff visited Dr. Raymond Pongonis, a general practitioner specializing in sports medicine and a close friend of Plaintiff's family since Plaintiff's childhood.  (Plf. Dep. 20-22, 254; Plf. Dep. Ex. 14; Pongonis Dep. pp. 35-36.)  Dr. Pongonis diagnosed Plaintiff with an anxiety disorder and prescribed the anti-anxiety medication, Lexapro. (Plf. Dep. p. 254; Plf. Dep. Ex. 14; Pongonis Dep. p. 46.)  Dr. Pongonis did not place any work or other restrictions on Plaintiff during his visit. (Plf. Dep. p. 258; Pongonis Dep. p. 50.)

After his visit with Dr. Pongonis on October 8, 2003, Plaintiff took time off work.  During his ten-day absence, Plaintiff called off from work on three separate occasions.  On October 15, 2003, Plaintiff requested a note from Dr. Pongonis excusing him from work from October 8 to October 18, 2003 (Plf. Dep. pp. 260-262; Plf. Dep. Ex. 14).

As Plaintiff was not scheduled to work October 18 or 19, 2003, he returned to work during the week of October 20, 2003.  Plaintiff submitted the doctor's excuse to Metzger at Lowe's when he returned to work. On the form, Dr. Pongonis did not provide an explanation and stated only that Plaintiff had been under his care and could return to work on October 18, 2003.  (Plf. Dep. p. 262; Plf. Dep. Ex. 14; Metzger Dep. p. 41.)  Plaintiff's leave was classified as approved sick leave for his absences from October 7, 2003 through October 17, 2003. (Metzger T. 41-42; Exhibit 1; Exhibit 2.)

-4-

At the beginning of his shift on his first day back, Plaintiff provided his doctor's note to Metzger for his absences and told her that he may need additional time off. (Plf's Dep., 263-264.) On the same day, after talking with Metzger, Plaintiff also spoke with Kincade. (Plf's Dep., 266; Kincade Dep, 33-34.) Plaintiff told Kincade about his symptoms while at work, that he had seen his physician, and that his physician had taken him off work. Plaintiff also told Kincade that he was having problems with the medications that his physician had prescribed him, but that he was going to try to come back to work. Kincade recalls only that Plaintiff informed him that he was having problems being around other people. (Kincade Dep., 32-34.)

Plaintiff's last day of active working in the store was October 21, 2003. (Plf. Dep. pp. 267-268.) He began to call into work to report off as being ill.

On November 5, 2003, Plaintiff attended his follow-up visit with Dr. Pongonis. (Pongonis Dep. p. 55; Plf. Dep. Ex. 14.) Dr. Pongonis noted that the Lexapro had improved Plaintiff's anxiety, depression and ability to go out in spaces and encouraged Plaintiff to continue on the medication, despite Plaintiff's complaints regarding the side effects, including insomnia. (Plf. Dep. Ex. 14.) Dr. Pongonis notes indicated a diagnosis of anxiety, depression and agoraphobia. He prescribed Ambien to help Plaintiff with insomnia. Dr. Pongonis did not impose any restrictions on Plaintiff's ability to work. (Pongonis Dep. pp. 61-63.)

**D.    Notice**

As for notice the Plaintiff needed time off under the FMLA, in early October 2003, Store Manager Hermsen had a telephone conversation with Plaintiff during which Plaintiff advised, in general terms, that he was "sick." (Hermsen Dep. p.14.) Hermsen asked Plaintiff to "keep me in

the loop." (Hermsen Dep. p. 14, 23.)[2] This is the last conversation that Hermsen had with Plaintiff (Id.). In addition, at some point Plaintiff advised Operations Manager Kinkaid that he was having an issue with being around a lot of people, but did not provide any further information (Kinkaid Dep. pp. 32-34). Neither Store Manager Hermsen nor Human Resources Manager Metzger were aware of the reasons for Plaintiff's absences in early to mid-October 2003, other than that Plaintiff was generally "sick" (Hermsen Dep. p. 19; Metzger Dep. pp. 61-62). Those absences were excused and Plaintiff received sick pay for the duration of that leave (Metzger Dep. pp. 67-70; Metzger Dep. Ex. 7.)

Plaintiff alleges that on November 4, 2003, he requested a second note from Dr. Pongonis (Plf. Dep. pp. 278-282). The existence of this letter and its contents are vigorously disputed by the parties. Plaintiff alleges that sometime during his absence that began on October 22, 2003, he contacted Dr. Pongonis to request another note excusing him from work. Dr. Pongonis agreed to provide a letter. (Plf's Dep. 277; Pongonis Dep., 64-65). Plaintiff alleges that he personally delivered the note to Metzger's mailbox at work, but did not speak to any of the managers because they were in a meeting and he was feeling anxious. (Plf.' Dep., 278.) During his deposition, Plaintiff was confused and could not recall either the date that he picked up the note from Dr. Pongonis or the dates that the doctor had excused him from work. (Plf. Dep., 281-82. 297-98.) Plaintiff now states in is affidavit, filed after his deposition, that he attempted to return to work before the date indicated in the letter by Dr. Pongonis for his resumption of work. (Brooks Aff. ¶ 13).

---

[2]     Plaintiff recalls this conversation as one that took place face-to-face. (Plf. Dep. pp. 250-51.)

Defendants point out that there is no copy of the note in Dr. Pongonis' medical file, despite his office's standard practice of placing copies of such notes into patient files or making a notation in the patient's chart (Pongonis Dep. pp. 31, 64-65). Further, Dr. Pongonis does not have specifically recall discussing the second note with Plaintiff, or directing his staff to prepare the second note. (Pongonis Dep. pp. 64-65.[3]) Moreover, Plaintiff does not have a copy of the second note.

### E.      Termination

According to Defendant's interpretation of Plaintiff's testimony at his deposition, the latest Dr. Pongonis' second note would have excused him from working would have been November 10, 2003. Lowe's policy required Plaintiff, within three days of that date, to report his absences and, after he had been absent for three days, to provide another note from Dr. Pongonis excusing his absences. Plaintiff does not contend that he received any other notes from Dr. Pongonis. (Plf. Dep. pp. 299-300.) According to Lowe's, it therefore would have been justified in terminating him as early as November 14, 2003.

Plaintiff testified that returned to the store to work one day during the latter part of November, 2003. On his way into the building, Plaintiff ran into an hourly employee named Sara, who informed him that she thought he had quit and was no longer with the Company. (Plf. Dep. pp. 93-97.) Plaintiff then alleges that he went to the front office and asked Assistant Store Manager Brian Green, the only manager around at that time, about his status. (Id.) Green advised him that he did not know. (Plf. Dep. pp. 94-95.) Plaintiff became upset and left the store. He did not attempt to locate Store Manager Hermsen or Human Resources Manager Metzger, or seeking any further

---

[3]      Dr. Pongonis has a vague recollection of directing a member of his staff to prepare a note excusing Plaintiff from work, but could not recall whether he had one or two conversations about the excuse or whether he authorized a return-to-work note more than once. (Pongonis Dep., 65-68.)

information about his employment. (Plf. Dep. pp. 95-96.) Plaintiff also did not advise anyone that he planned on returning to work. (Plf. Dep. pp. 95-96.) The next day, Plaintiff telephoned Lowe's and requested to speak with Hermsen, but Hermsen was unavailable. (Plf. Dep., 95-96.) Plaintiff requested that Hermsen call him back, but never received a return phone call. (Brooks T. 95-96; Brooks Aff. ¶ 14).

Lowe's continued to hold Plaintiff's position open until November 26, 2003. Lowe's records indicate that Plaintiff's last day in the store working was October 21, 2003. Store Manager Hermsen made the decision to terminate Plaintiff for job abandonment. (Hermsen Dep. pp. 10, 12-13, 26; Metzger Dep. pp. 57, 97-99, 103-104.)

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his or its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non-moving party. *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does

not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)(citing *John v. State of La. (Bd. of Tr. for State Coll. & Univ.)*, 757 F.2d 698, 705 (5th Cir.1985)).

The standard of review for cross motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248. The Court will consider each party's motion separately, determining, for each side, whether a judgment may be entered in accordance with the standards of Rule 56 standard. Both motions must be denied if the Court finds that there is a genuine issue of material fact. If, however, there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the Court will render judgment.

### III.

The parties each move for summary judgment with respect to Plaintiff's claim under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* The FMLA entitles eligible employees to a leave of absence for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves continuing treatment by a health care provider. 29 C.F.R. § 825.114(a)(2). A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

> (I)  A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any

subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A)     Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B)     Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i)(A) & (B).  In defining serious health condition, the focus is on distinguishing between inpatient care and continuing treatment.  In each instance, the intent of the statute is to avoid covering short-term conditions for which treatment and recovery are very brief, because these would be expected to be covered by an employer's ordinary sick leave policies.  60 Fed. Reg. 2191.

Under the FMLA, it is "unlawful  for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a)(1).  An employer is required to grant leave to eligible employees when a serious health condition "makes the employee unable to perform the functions of the employee's job." 29 C.F.R. § 825.112(a)(4).

Plaintiff moves for summary judgment, arguing that Lowe's interfered with and restrained his FMLA rights by using FMLA-protected absences as a basis for discharging him.  Plaintiff contends that Lowe's interfered with and restrained his FMLA rights by failing to restore him upon his return from FMLA leave.  Plaintiff maintains that he provided Lowe's with proper notice and that he had a serious health condition that entitled him to FMLA leave.  Defendant-Lowe's, on the other hand, contends that Plaintiff cannot establish a claim under the FMLA because he cannot prove that he suffered from a serious health condition or that he gave Lowe's proper notice of his intention to

-11-

take leave. Because genuine issues of material fact remain for resolution on these key issues, both parties' Motions for Summary Judgment will be denied.

**Plaintiff's FMLA Interference Claim**

Plaintiff claims that Lowe's violated the FMLA "by using an FMLA-qualifying leave as a negative factor in discharging Plaintiff. (Plf. Complaint ¶ 19.) To establish a claim that Lowe's interfered with his rights under the FMLA, Plaintiff must establish that: (1) he is an eligible employee; (2) Lowe's is an "employer" as defined in the Act; (3) he was entitled to leave under the FMLA; (4) he gave Lowe's notice of his intention to take leave; and (5) Lowe's denied him FMLA benefits to which he was entitled. *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003); *Bradley v. Mary Rutan Hosp. Assoc.*, 322 F. Supp. 2d 926, 940, n. 16 (S.D. Ohio 2004).

The parties do not dispute that Plaintiff was an eligible employee and that Lowe's is an "employer" under the FMLA. The parties dispute, and argue that summary judgment is appropriate for their respective side, on the issue of whether Plaintiff had a serious health condition which entitled him to leave, and whether he gave notice of his intention to take leave.

### (1.) *Serious Health Condition*

Defendant maintains that Plaintiff cannot establish that he had a serious health condition because he suffered only from various symptoms which Plaintiff himself diagnosed as an anxiety disorder. Defendant argues that Dr. Pongonis never concluded that Plaintiff suffered from a mental health condition, but merely accepted Plaintiff's self-diagnosis.

Dr. Pongonis assessed and diagnosed Plaintiff first with an anxiety disorder and later with depression, insomnia and agoraphobia. Dr. Pongonis prescribed anti-anxiety and insomnia medication. He excused plaintiff from work at least 10 days, advising on the doctor's excuse that

Plaintiff had been under his care.  This evidence makes the cases cited by Defendant, including *Lackey v. Jackson County, Tenn.* 2004 WL 1491636 (6ᵗʰ Cir. June 22, 2004)(unreported); *Bond v. Abbott Laboratories*, 7 F. Supp. 2d 967 (N.D. Ohio 1998); and *Brannon v. Oshkosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1037 (M.D. Tn. 1995), distinguishable because in those cases, the plaintiffs merely self-diagnosed their conditions without clear medical support to verify their hypotheses.  In contrast to those cases, Plaintiff has adduced independent corroborating medical support that he was suffering from anxiety, depression and agoraphobia.  Dr. Pongonis avers that, "[b]ased on [his] diagnoses, treatment plans, prescriptions and [Plaintiff's] history [he] determined that the time off was appropriate and that [Plaintiff] required the time off for his recovery."  (Pongonis Aff., ¶ 8.)

Defendant maintains that Plaintiff may not, in any event, demonstrate that he had a serious medical condition on the date of his termination, November 26, 2003.  For its argument, Defendant objects to the existence of the second medical excuse, and the dates for which Dr. Pongonis excused Plaintiff, if at all, from work.  Discounting the existence of the second note, Defendant argues that Plaintiff cannot establish that he had a serious medical condition as of the date he was terminated from his employment.  Plaintiff contends that his second doctor's excuse would have permitted his absence through the day he attempted to return to work in mid- to late November, 2003.  Moreover, Dr. Pongonis has a recollection that he directed a member of his staff to prepare an excuse keeping Plaintiff off work for a period of time in November, 2003.  When Plaintiff did return, he left the store in anger with the understanding that he had been terminated.  Lowe's does not dispute that it used Plaintiff's absences beginning October 25, 2003, including any that may be related to time off during which Dr. Pongonis had excused him from work, in its decision to discharge Plaintiff. Resolution of these issues will affect the outcome of this lawsuit and the evidence is such that a reasonable jury

-13-

could return a verdict in favor of either party. Accordingly, Defendant is not entitled to summary judgment on the issue of whether Plaintiff had a serious medical condition that entitled him to FMLA leave.

Nevertheless, this determination does not compel a counter-conclusion that Plaintiff has established, as a matter of law, that he suffered a serious health condition. Plaintiff seeks judgment because he has adduced evidence that shows he was treated two times by Dr. Pongonis, and that Dr. Pongonis provided him with two notes[4] taking him off of work for more than three days. Plaintiff therefore contends that he has established a serious health condition by virtue of the fact that he had a single treatment by a health care provider followed by a regimen of prescription medication under the supervision of the health care provider. *See* 29 C.F.R. § 825.114(a)(2)(i)(B).

Plaintiff, however, has not demonstrated as a matter of law that he was incapacitated for three or more consecutive days. To demonstrate that he was entitled to leave under the FMLA, Plaintiff must establish "the objective existence of a serious health condition." *Bauer v. Variety Dayton-Walther Corp.*, 118 F.3d 1109, 1112 (6th Cir. 1997). Moreover, Plaintiff must demonstrate, in addition to his treatment and prescription regimen, that he was *incapacitated*. That is, Plaintiff must prove that he was "unable to work or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days . . . ." 29 C.F.R. § 825.114(a)(2)(I). On these matters, the record is replete with factual disputes. Because Plaintiff cannot show with uncontroverted evidence that he was prevented from working because of his condition, particularly at the time of his termination at the end of November, he is not entitled to summary judgment.

---

[4]      As noted, the issue of Dr. Pongonis's second note is disputed by the parties.

### (2.)   *Notice*

In this case, the Court determines that questions relating to notice, including whether Plaintiff

provided it, and if so, what the notice consisted of and when it was given, are matters best left to the

jury as the triers of fact. "[T]o invoke the protection of the FMLA, an employee must provide notice

and a qualifying reason for requesting the leave." *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th

Cir.1998).  The burden of providing notice is not meant to be onerous.  *See O'Hara v. Mt. Vernon

Bd. of Educ.*, 16 F. Supp.2d 868, 890 (S.D. Ohio 1998)(employee need only provide minimal

information about the need for leave). "The employee need not expressly assert rights under the

FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be

expected to obtain any additional required information through informal means."  29 C.F.R. §

825.303(b); *Cavin v. Honda of America Mfg.*, 346 F.3d 713,723 (6th Cir. 2003); *Hammon v. DHL

Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999).  Because an employee need not expressly invoke

the FMLA, "[t]he critical question is whether the information imparted to the employer is sufficient

to reasonably apprise it of the employee's request to take time off for a serious health condition."

*Brohm*, 149 F.3d at 523 (quotation omitted); *Cavin*, 345 F.3d at 723.   "[A]n employee gives his

employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he

gives the employer enough information for the employer to reasonably conclude that an event

described in the FMLA § [2612(a)(1)] has occurred." *Hammon*, 165 F.3d at 451.

The question in this case is whether Plaintiff provided sufficient notice of his need for FMLA

leave to shift the burden to Lowe's to obtain additional information.  Clearly there is a disputed issue

of material fact as to the content of the notice Plaintiff gave to Lowe's.  Plaintiff's supervisors knew

that Plaintiff suffered from a condition that kept him off of work between October 8, 2003 through

-15-

October 18, 2003.  The parties dispute whether Plaintiff was incapacitated and suffering from a serious health condition beginning on October 22, 2003 into mid-November.  Lowe's knew that Plaintiff had sought medical treatment from his physician at least once, as evinced by his first doctor's excuse and conversations that Plaintiff had with Metzger and Hermsen when he first returned to work.  Lowe's knew that Plaintiff was taking prescribed medication.  Plaintiff informed Lowe's upon returning from his original ten day leave of absence that he may need more time off work because of his condition.

Within two days of returning to work following his initial ten day leave of absence and conversations with his managers, Plaintiff again called off of work by contacting Kincade and telling him that he was having issues sleeping based on the medications that he was taking.  Plaintiff continued to call off of work for about a week.  Again, the parties dispute whether Plaintiff turned in a second doctor's note and whether he returned to work prior to the time his second doctor's note expired.

These disputed matters make clear that summary judgment for either party is inappropriate. It is within the province of the jury to determine the facts surrounding Plaintiff's notice of leave. Because many of the facts regarding notice remain in dispute, at this juncture, the Court cannot determine as a matter of law whether the underlying circumstances were sufficiently reasonable to give Lowe's notice as required by the FMLA.  Accordingly, the parties' Cross-Motions for Summary Judgment are denied as to the issue of notice.

## IV.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. #13) is **DENIED**; Defendant's Motion for Summary Judgment (Doc. #11) is **DENIED**. The Clerk is directed to issue an Order Setting Trial Date and Settlement Conference establishing dates for final resolution of this case as soon as practicable.

**IT IS SO ORDERED.**

_3-27-2006_
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

-17-